1
2
3
4
5    **UNITED STATES DISTRICT COURT**
6    **DISTRICT OF NEVADA**
7
8    SERGIO MORALES,                          2:10-CV-2171 JCM (VCF)
9             Plaintiff,
10   v.
11   CITY OF NORTH LAS VEGAS, et al.,
12            Defendants.
13
14
15                  **ORDER**
16       Presently before the court is defendants' motion for summary judgment.  (Doc. # 61).
17   Plaintiff has filed a response (doc. # 93) and defendants have filed a reply (doc. # 96).
18       Also before the court is plaintiff's countermotion for summary judgment.  (Doc. # 76).
19   Defendants have filed a response (doc. # 79) and plaintiff has filed a reply (doc. # 97).
20   **I.    Background**
21       This action stems from the murder of Sergio Hugo Morales-Paredes ("Morales") while being
22   held in the pre-trial custody of the North Las Vegas Detention Center ("NLVDC").
23       On March 16, 2009, Morales was arrested on the grounds of St. Christopher's School in
24   North Las Vegas, Nevada, for trespass and loitering on the grounds of a playground or school where
25   children congregate, in violation of NRS §§ 207.200 and 207.270, respectively.  The individual who
26   placed the call, Debbie Barnaby, told the responding officers that Morales had refused to leave when
27   asked.
28

**James C. Mahan**
**U.S. District Judge**

When questioned, Morales told the responding officers that he was on school grounds because he was formerly a teacher and enjoyed hanging around schools. After further questioning, Morales indicated that he was attracted to young girls. It was apparent to the officers that Morales was mentally ill to some degree. Officers investigated the latter statement but did not find any evidence that it was anything more than "mere fantasy." Morales was not arrested for a sexually related offense.

Morales was booked into the NLVDC for the trespassing and loitering charges that same day. As part of the booking process he was medically screened by Sheila Black ("Black"), a nurse employed by NaphCare, Inc. Morales admitted to Black that he had mental problems which he managed with medication, but that he was not taking those medications at that time. Black recommended that Morales be housed in administrative segregation because his medical illness made him unfit for general population. Black also determined that Morales could have a cell mate within administrative segregation, and noted that he spoke very little English. Over the next several days, Morales' condition improved with the medication.

Defendant Prescilla Tenuta ("Tenuta") is a classification officer at the NLVDC. Her job responsibilities include reviewing a detainee's file (including their medical screening evaluation), interviewing that person, and making a determination as to how to classify and where to house the inmate.

On March 31, 2009, Armando Munoz-Ornales ("Munoz") was detained at the NLVDC on an immigration offense. During the booking process, Munoz began showing signs of mental illness and was classified for segregation by Tenuta. Tenuta noted that Morales had no cell mate, both Morales and Munoz were Spanish speaking, neither had any apparent gang affiliation, and neither had a known history of violent behavior. Tenuta relayed this information to her supervisors on duty, defendants Giarmo and Woolman. Based on these observations, Tenuta assigned Munoz to Morales' cell.

Morales and Munoz were celled together around 11:00 p.m. on April 1, 2009. Approximately three and a half hours later, Morales was found dead in the cell. The coroner

1  identified the immediate causes of death as asphyxia, manual strangulation, blunt force trauma to

2  the head, and ligature strangulation.

3      During the initial investigation, Munoz confessed to the killing.  Munoz told detectives that

4  Morales had told him he was going to kill him and that he was in fear for his own life.  Munoz did

5  not make any reference to Morales' sexual preferences.

6      Acting as special administrator and as the father and heir of the estate of Sergio Hugo

7  Morales-Paredes, Sergio Morales Sr. ("plaintiff") has filed an amended complaint alleging causes

8  of action for: (1) violation of the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983

9  against all defendants in their official and individual capacities; (2) wrongful death in violation of

10 NRS 41.085 against all defendants; (3) negligent training, supervision, and retention against the City

11 of North Las Vegas and defendants Forti, Chronister, Powell, and Woolman; and (4) municipal

12 liability pursuant to 42 U.S.C. § 1983.

13 **II.   Legal Standard**

14     The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings,

15 depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

16 show that "there is no genuine issue as to any material fact and that the movant is entitled to a

17 judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is

18 "to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

19 323–24 (1986).

20     In determining summary judgment, a court applies a burden-shifting analysis.  "When the

21 party moving for summary judgment would bear the burden of proof at trial, it must come forward

22 with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.

23 In such a case, the moving party has the initial burden of establishing the absence of a genuine issue

24 of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213

25 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

26     In contrast, when the nonmoving party bears the burden of proving the claim or defense, the

27 moving party can meet its burden in two ways:  (1) by presenting evidence to negate an essential

28

**James C. Mahan**
**U.S. District Judge**

- 3 -

element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

**III.   Discussion**

Each party moves for summary judgment in its favor as to all claims. The material facts relating to each defendants' conduct are essentially undisputed.

**James C. Mahan**
**U.S. District Judge**

- 4 -

1        (1) Violation of the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983 against

2    all defendants in their official and individual capacities.

3        Plaintiff's first cause of action is against all defendants in their official and individual

4    capacities, alleging that Morales' Fourteenth Amendment rights were violated.  In response,

5    defendants assert they are all entitled to qualified immunity.

6        The doctrine of qualified immunity "balances two important interests–the need to hold public

7    officials accountable when they exercise power irresponsibly, and the need to shield officials from

8    harassment, distraction, and liability when they perform their duties reasonably." *Pierson v.*

9    *Callaghan*, 555 U.S. 223, 231 (2009).

10       The defense protects "government officials performing discretionary functions . . . from

11   liability for civil damages insofar as their conduct does not violate clearly established statutory or

12   constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

13   U.S. 800, 818 (1982).  "The principles of qualified immunity shield an officer from personal liability

14   when an officer reasonably believes that his or her conduct complies with the law." *Pearson*, 555

15   U.S. at 244.

16       Resolving qualified immunity claims is a two-step inquiry into the following: 1) whether the

17   plaintiff has alleged or shown a violation of a constitutional right, and 2) whether the right at issue

18   was clearly established at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 232.

19   "The judges of the district courts and the courts of appeals should be permitted to exercise their

20   sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

21   addressed first in light of the circumstances and in the particular case at hand." *Id.* at 236.

22       A pretrial detainee, such as Morales, derives protection from the Fourteenth Amendment.

23   *See Bell v. Wolfish*, 441 U.S. 520 (1979).  In the Ninth Circuit, a pretrial detainee's rights under the

24   Fourteenth Amendment are often analogized to a prisoner's rights under the Eighth Amendment

25   using the "deliberate indifference" standard. *See, e.g., Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.

26   1998)("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to

27   prisoners' rights under the Eighth Amendment. . .we apply the same standards."); *see also Gibson*

28

**James C. Mahan**
**U.S. District Judge**

*v. Cnty. of Washoe*, 290 F.3d 1175, 1188 & n. 9 (9th Cir. 2002)(applying the "deliberate indifference" standard to the claims of a mentally ill pretrial detainee who died in custody); *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1461 & n. 2 (9th Cir. 1988)(applying the "deliberate indifference" standard to a § 1983 claim by the mother of a pretrial detainee who committed suicide in detention, and explaining that "the fourteenth amendment due process rights of pretrial detainees are analogized to those of prisoners under the eighth amendment"), *vacated on other grounds*, 490 U.S. 1087 (1989), *opinion reinstated*, 886 F.2d 235 (9th Cir. 1989).

"A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994) (citations omitted). A prison official violates the Eighth Amendment when he is deliberately indifferent "to a substantial risk of serious harm to an inmate." *Id.* at 828.

An official has the duty to "take reasonable measures to guarantee the safety of inmates," which includes protecting prisoners from "violence at the hands of other prisoners." *Id.* at 832-33. The official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[P]rison officials who lack knowledge of risk cannot be said to have inflicted punishment." *Id.* at 844.

Even if there are "underlying facts indicating a sufficiently substantial danger," a prison official cannot be found liable if he or she is unaware of the danger or believed, no matter how unsoundly, that the risk was insubstantial or nonexistent. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* at 845.

First, plaintiff asserts that each defendant was deliberately indifferent because housing two mentally ill individuals together creates an obvious and substantial risk of serious harm. Double-celling is not *per se* constitutionally impermissible. *Estate of Ford v. Ramirez-Palmer*, 301 F.3d

James C. Mahan
U.S. District Judge

1043, 1051 (9th Cir. 2002)(citing *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981)).  In fact, double-celling an inmate with mental health issues, without more, is not constitutionally impermissible.  *See Hammonds v. Martel*, 361 Fed.Appx. 813 (9th Cir. 2010).  Thus the fact that Morales and Munoz were classified as mentally ill when celed together, without more, does not demonstrate that defendants knew of, and were deliberately indifferent to, a substantial risk of serious harm.

Second, plaintiff points to the fact that Munoz had previously been arrested for, *inter alia*, misdemeanor battery as further proof that Munoz posed an obvious and substantial risk of harm to Morales.   In the instant case, however, Munoz had been arrested by federal officials on an immigration violation, and had been transferred to the NLVDC for holding pending removal proceedings.

Tenuta testified that the booking technicians do not run background checks on inmates detained by ICE or by the U.S. marshals.  Instead, NLVDC officials sometimes rely on those agencies to inform them whether the inmate has a history of violence.  In other instances, it is left up to classification officers (such as Tenuta) to do so.  Simple battery, as opposed to battery with a weapon, is not considered a "violent" crime by the NLVDC for purposes of classification.

Tenuta testified that 1) ICE did not inform anyone at the NLVDC that Munoz had any known history of violence, and 2) that she did not run a background check that day because it is not a formal requirement, and she did not have time to do so before going home for the evening.  Tenuta was therefore unaware of Munoz's prior charge for misdemeanor battery.[1]  As a result, the fact that Munoz had previously been arrested for misdemeanor battery is irrelevant for purposes of this claim. Tenuta had no information or reason to believe Munoz was violent when classifying him.  *See Farmer*, 511 U.S. at 837 (1994)(". . .the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Even if, *arguendo*, there was an established policy requiring Tenuta to run a background

---

[1]  This is assuming that a single charge for a misdemeanor battery would give officials reason to suspect that a particular individual posed a significant risk of violence.  This alone is highly questionable.

James C. Mahan
U.S. District Judge

check on ICE transfers prior to classification, her failure to do so does not give rise to liability under Section 1983. *Estate of Ford*, 301 F.3d at 1052 ("Failure to follow prison procedures, which called for doing so before making a housing decision, was certainly negligent; but negligence, or failure to avoid a significant risk that should be perceived but wasn't, cannot be condemned as the infliction of punishment.") (citations omitted).

Next, plaintiff asserts that Morales was arrested for a sex offense, that Morales had admitted he had past sexual encounters with minors, and that Tenuta knew pedophiles are at risk. Based on these allegations, plaintiff asserts defendants should have known that double-celling Morales would present a substantial risk of serious harm. This argument fails for several reasons.

First, Morales was arrested for loitering about a school or public place where children congregate in violation of NRS 207.270. That statute reads in its entirety: "Any person who, without legitimate reason to supervise any of such children or other legitimate reasons to be at leisure in such place, loiters about any school or public place at or near which children attend or normally congregate is guilty of a misdemeanor." Chapter 207 is a listing of "miscellaneous crimes"; there is no indication that NRS 207.270 is a sex crime.

Second, plaintiff's argument that legislative history indicates the statute was intended to protect children from sexual predators is irrelevant. To the extent the legislative history may be relevant, there is no evidence that Tenuta was aware of that history. In fact, with respect to the classification of Morales, Tenuta testified in her deposition as follows:

(Discussing the classification form)

Q. Can you show me where the area is dealing with their background as a sex offender?

A. Yes. Have you ever been charged with child molestation sexual assault or rape? Where and when?

Q. Okay. And on this particular form, do you recall how it was answered?

A. Based on the form, it says no.

(Exh. F, doc. #82, p. 29, ln. 9-16).

1    With respect to the offenses themselves, Tenuta testified as follows:

2

3        Q. All right. The charge one is trespassing. The second one is dealing
         with loitering on a playground or school where children congregate.
4        Do you recall if you ever saw this charge before Mr. Morales?

5        A. Yes.

6        Q. And did you consider that to be a sex crime?

7        A. No.

8        Q. And why is that?

9        A. It's not charged as a sex crime. It's not a felony or gross
         misdemeanor. It's not something where even if convicted of that
10       charge he would have to register legally as a sex offender. I don't
         even believe it's in the statutes under the sex offense category.

11

12   (Exh. F, doc. # 82, p. 33 ln. 14-25, p. 34 ln. 1-4).

13   As far as Tenuta was aware, Morales had been booked on charges of simple trespass and trespassing

14   on the grounds of a school–charges that are not classified as sex offenses either by statute or by the

15   NLVDC's classification policies.

16        This argument further fails because Morales had no history of prior sex offenses, including

17   arrests or convictions for such. In addition, Tenuta had not reviewed the police report or declaration

18   of arrest–which mentioned Morales' comments to the arresting officers regarding his attraction to

19   young girls–at the time of classification.

20        In defining the deliberate indifference standard, the Supreme Court has held that:

21       A prison official cannot be found liable under the Eighth Amendment
         for denying an inmate humane conditions of confinement unless the
22       official knows of and disregards an excessive risk to inmate health or
         safety; the official must both be aware of facts from which the
23       inference could be drawn that a substantial risk of serious harm
         exists, and he must also draw the inference.
24

25   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

26        Plaintiff argues that the fact Morales was killed at the hands of Munoz serves as conclusive

27   proof that Munoz initially posed an excessive and obvious risk to the health or safety of Morales.

28

James C. Mahan
U.S. District Judge                                    - 9 -

1    Plaintiff places the cart before the horse.  The fact that Morales was murdered does not demonstrate

2    that, at the time the decision was made to cell the two together, a substantial risk existed, or that

3    defendants were aware of facts from which that inference could be drawn.  In fact, the evidence

4    presented demonstrates that defendants were unaware of several of facts which form the basis of

5    plaintiff's argument–in particular, Morales' comments regarding his affinity towards young girls,

6    and Munoz's prior arrest for misdemeanor battery.

7         *At the very most*, plaintiff may argue that housing two mentally ill inmates together, one of

8    which has a single charge of misdemeanor battery, and the other a charge of loitering on a school or

9    playground where children are present, is simple negligence.  However, "merely being negligent, or

10   failing to alleviate a significant risk that [one] should have perceived but did not, is not

11   constitutionally deficient conduct."  *Estate of Ford,* 301 F.3d at 1050 (quoting *Farmer*, 511 U.S. at

12   838).

13        Taken together, the information available to defendants at the time did not make it so clear

14   that Munoz posed a significant risk of harm to Morales that no reasonable officer could have agreed

15   to allow them to be celled together.  *Estate of Ford*, 301 F.3d at 1045, 1051 ("Although

16   [defendant's] decision. . .to allow [the killer] to be double-celled with [the victim] turned out to be

17   quite unfortunate judgments, we cannot say that a reasonable correctional officer would have clearly

18   understood that the risk of serious harm was so high that he should not have authorized the double-

19   celling.").

20        Accordingly, defendants are entitled to immunity.  Summary judgment is granted in favor

21   of the defendants as to this claim.

22        (2) Municipal liability pursuant to 42 U.S.C. § 1983.

23        Plaintiff asserts a *Monell* claim against the City of North Las Vegas based on its

24   "unconstitutional policies and ratification of the individual defendants' misconduct."

25        Plaintiff broadly alleges that the city has the following unconstitutional policies: (1) not

26   investigating the backgrounds of inmates that the city holds for ICE; (2) refusing to consider simple

27   battery (as opposed to battery with the use of a weapon) a violent crime for purposes of

28

James C. Mahan
U.S. District Judge

- 10 -

classification; (3) failing to prohibit the double-celling of a mentally ill inmate whom had not undergone a psychiatric evaluation; and, (4) double-celling mentally ill inmates.

None of these four "policies" are facially unlawful. "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (*citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989)). "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407.

"The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404 (emphasis in original).

"Considerably more proof than the single incident will be necessary to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). "[T]he existence of a *pattern* of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, *rather than a one-time negligent administration* of the program or factors peculiar to the officer involved in the particular incident, is the 'moving force' behind the plaintiff's injury." *Brown*, 520 U.S. at 407-08 (*citing City of Canton*, 489 U.S. at 390-91) (emphasis added).

Here, plaintiff's only argument seems to rely on the cumulative effect of these four "policies" in a single instance–i.e., the death of Morales. Plaintiff has pointed to no other similar instances or events involving these policies.

It is well established that municipalities may not be held liable under Section 1983 on the basis of *respondeat superior*. *See, e.g., Monell*, 436 U.S. at 692. There must exist a sufficiently strong causal link between the policy or custom and constitutional deprivation, because "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability

James C. Mahan
U.S. District Judge

- 11 -

1    collapses into *respondeat superior* liability.  *Brown*, 520 U.S. at 415.

2           While unfortunate, this isolated incident tends to demonstrate that Morales' death was the

3    result of independent criminal action by Munoz, and was not caused by any alleged unconstitutional

4    policies.  There is no evidence that the city has exhibited a deliberate indifference to a pattern of

5    similar conduct, nor can the court conclude that the risk of harm to Morales was so "obvious" that

6    the city can be said to have been deliberately indifferent to its possibility.  *Brown*, 520 U.S. at 409-

7    410 ("[A] high degree of predictability may also support an inference of causation–that the

8    municipality's indifference led directly to the very consequence that was so predictable."); *see also*

9    *City of Canton*, 489 U.S. at 390, and n. 10 (discussing possibility that a single incident accompanied

10   by a showing municipality has failed to train employees to handle recurring situations presenting an

11   obvious potential for a violation may trigger municipal liability).

12          Summary judgment is granted in favor of defendants as to this claim.

13          (3) State law claims

14          The final remaining claims are those for wrongful death and negligent hiring, training, and

15   retention.

16          This court has the discretion to decline to hear supplemental state law claims once it has

17   dismissed all federal claims.  *San Pedro Hotel Co., Inc v. City of Los Angeles*, 159 F.3d 470, 478

18   (9th Cir.1998); 28 U.S.C. § 1367(c) (stating that a "district court[ ] may decline to exercise

19   supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction.").

20   "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors

21   will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Acri v.*

22   *Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (ellipses omitted) (quoting *Carnegie-Mellon*

23   *Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

24          Each of plaintiff's remaining claims are state law tort claims.  The issue of whether the

25   defendants are liable on the remaining tort law claims is best resolved by Nevada state courts

26   interpreting Nevada law.  These claims are dismissed without prejudice.

27   . . .

28

**James C. Mahan**
**U.S. District Judge**

- 12 -

1  **IV.      Conclusion**

2      The decision to cell Morales and Munoz together cannot be said to have been made in

3  deliberate indifference to a substantial risk of serious harm.  As such, defendants are entitled to

4  qualified immunity from the § 1983 claim.

5      In addition, plaintiff has failed to shoulder its burden in demonstrating Morales' death was

6  the result of an unconstitutional policy or custom sufficient to establish a *Monell* claim.

7      Because both federal claims are disposed of, the court declines to exercise supplemental

8  jurisdiction over the remaining state law claims and will dismiss them without prejudice.

9      Accordingly,

10     IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiff's motion for

11  summary judgment (doc. # 76) be, and the same hereby is, DENIED.

12     IT IS FURTHER ORDERED that defendants' motion for summary judgment (doc. # 61) be,

13  and the same hereby is, GRANTED IN PART and DENIED IN PART consistent with the foregoing.

14  Defendants shall submit a proposed judgment.

15     DATED March 19, 2014.

16

17  _____

18  **UNITED STATES DISTRICT JUDGE**

19

20

21

22

23

24

25

26

27

28

James C. Mahan
U.S. District Judge

- 13 -