UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SERGIO MORALES, | Case No. 2:10-CV-2171 JCM (LRL) |
| Plaintiff(s), | ORDER |
| v. | |
| CITY OF NORTH LAS VEGAS, et al., | |
| Defendant(s). | |

Presently before the court is the December 14, 2016, memorandum of the Ninth Circuit Court of Appeals regarding this court's grant of summary judgment in favor of all defendants. (ECF Nos. 99, 112). The Ninth Circuit affirmed this court's judgment as to defendant North Las Vegas, but it also vacated the judgment and remanded as to the individual defendants. (ECF No. 112). This court now applies the Ninth's Circuit's holding in *Castro v. Cnty. of L.A.* 833 F.3d 1060 (9th Cir. 2016), *cert. denied Cnty. of L.A., v. Castro*, 137 S. Ct. 831 (2017).

In accordance with the Ninth Circuit's decision, defendants Chief of Police Joseph Forti, Captain Dave Noahr, Chief/Assistant Chief Joseph Chronister, Lt. Dave Powell, Sgt. Jeff Rogers, Sgt. Jimmie Campbell, Classification Counselor Patricia McCafferty, Classification Technician Priscilla Tenuta, Sgt. Tim Giarmo, Lt. Danny Woolman, and Correctional Officer Andrew Mote ("defendants") filed a renewed motion for summary judgment. (ECF No. 118).

Plaintiff Sergio Morales, as special administrator and as the father and heir of the estate of Sergio Hugo Morales-Paredes, ("plaintiff") responded (ECF No. 130), and defendants timely replied (ECF No. 135).

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

## I.    Introduction

This action stems from the killing of Sergio Hugo Morales-Paredes ("Morales") while being held in the pre-trial custody of the North Las Vegas Detention Center ("NLVDC"). (ECF No. 118 at 2).

On March 16, 2009, Morales was arrested near St. Christopher's School for "trespass . . . and loitering on the grounds of a playground or school where children congregate." (*Id.* at 3). Both offenses are misdemeanors, in violation of Nevada Revised Statutes ("NRS") §§ 207.200 and 207.270, respectively. Debbie Barnaby, the PE teacher at St. Christopher's School, had called the police after Morales refused to leave the grounds of St. Christopher's School on two separate occasions—once while the seventh-grade PE class was outside, and another while the third-grade PE class was outside. (ECF No. 118-4 at 2).

Morales was located by the police directly behind the school. (ECF No. 118-5 at 5). Morales was arrested, received his *Miranda* warning, and told the officers he was willing to talk to them without an attorney present. (*Id.*). Morales told the responding officers that he was on school grounds because he had hoped to play soccer with the children. (*Id.*).

After further questioning, Morales indicated that he was attracted to young girls and was at the school hoping to make contact with one. (*Id.*). Morales also stated that his youngest sexual partner was 10 years old. (*Id.*). The arresting individual, Officer Santos, indicated that it seemed Morales had some kind of mental illness or disability and was unsure if Morales was describing past occurrences or fantasies. (*Id.*). Officer Santos made contact with Morales's brother, who confirmed Morales had a mental illness and was currently off of his medication. (*Id.* at 6).

Morales was booked into the NLVDC for the trespassing and loitering charges that same day. (ECF No. 118 at 3). As part of the booking process he was medically screened by Sheila Black ("Black"), a nurse employed by NaphCare, Inc. (ECF Nos. 118 at 3–4, 118-6). Morales admitted to Black that he had a "history of mental illness," for which he "[took] meds, but [could not] remember [the] name of [the] meds." (ECF No. 118-6 at 14). Morales admitted he was off his medication at the time and was hearing voices telling him "they want to kill [him]." (*Id.*). Morales was willing to see a psychiatrist and go back on his medication. (*Id.*).

James C. Mahan
U.S. District Judge

- 2 -

1 Black recommended that Morales be housed in administrative segregation because his mental illness made him unfit for general population. (*Id.* at 13). Black also determined that Morales "could have a cellmate within administrative segregation and advised that he spoke very little English." (ECF No. 118 at 4). Over the next several days, Morales' condition improved with the medication. (*Id.*).

On March 31, 2009, Armando Munoz-Ornales ("Munoz") "was brought to the [NLVDC] by federal authorities for an immigration violation." (*Id.*). During the booking process, Munoz showed signs of mental illness. (*Id.*). Defendant Prescilla Tenuta ("Tenuta") is a classification officer at NLVDC. (*Id.*). Tenuta "noted that the ICE booking officer described Munoz-Ornelas as 'mentally ill' and he was scheduled for a psychiatric evaluation on April 2, 2009." (*Id.* at 5).

Tenuta classified Munoz for medical segregation. (*Id.*). Tenuta noted that Morales had no cell mate, and "[b]ecause both men were young, Spanish speaking, had no apparent gang affiliation, and had no history of violent behavior, she assigned Munoz to [c]ell 20 with [Morales]." (*Id.* at 5).

Morales and Munoz were confined together in a cell at roughly 11:00 p.m. on April 1, 2009. (*Id.*). Corrections officers checked the cell at 2:00 a.m. on April 2; both Morales and Munoz were alive. (ECF No. 118-12 at 6). At approximately 2:30 a.m., corrections officers found Morales dead. (*Id.*). The coroner "identified the immediate causes of death as asphyxia, manual strangulation, blunt force trauma to the head, and ligature strangulation." (ECF No. 118 at 5); *see also* (ECF No. 118-29 at 2).

During the initial investigation, Munoz confessed to the killing. (ECF No. 118 at 5). Munoz told detectives that he was in fear for his own life because Morales had threatened to kill him. (*Id.*). Munoz did not reference any suspicion that Morales was a sex offender. (*Id.*).

On January 30, 2012, plaintiff filed an amended complaint alleging causes of action for: (1) violation of the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983 against all defendants in their official and individual capacities; (2) wrongful death in violation of NRS 42.085 against all defendants; (3) negligent training, supervision, and retention against the city of

James C. Mahan
U.S. District Judge

- 3 -

1  North Las Vegas and defendants Forti, Chronister, Powell, and Woolman; and (4) municipal
2  liability pursuant to § 1983.  (ECF No. 35).

3   This court granted summary judgment for all individual defendants as to claim one, holding
4  that plaintiff's § 1983 claim was barred by qualified immunity.  (ECF No. 99).  The court granted
5  summary judgment for the City of North Las Vegas as to claim four, which was affirmed by the
6  Ninth Circuit on appeal.  (ECF Nos. 99, 112).  As claims two and three were based on state law
7  without an individual basis for federal jurisdiction, the court declined to exercise supplemental
8  jurisdiction over them.  (ECF No. 99).  The Ninth Circuit vacated this court's decision as to the §
9  1983 claim against the individual defendants, and remanded for reconsideration in light of *Castro*.
10  (ECF No. 112).

**II.   Legal Standard**

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990).  However, to be entitled to a denial of summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

In determining summary judgment, a court applies a burden-shifting analysis.  The moving party must first satisfy its initial burden.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).

**James C. Mahan**
**U.S. District Judge**

- 4 -

1   By contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the non-moving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

- 5 -

**III.   Discussion**

   *A.   42 U.S.C. § 1983*

Plaintiff's § 1983 claim is predicated on defendants' deliberate indifference to the plaintiff's safety and subsequent failure to protect. (ECF No. 35). In particular, plaintiff alleges that the decision to house Morales and Munoz together was a breach of defendants' duty to protect plaintiff, thereby subjecting Morales to "suffer cruel and unusual punishment and a violation of his due process rights pursuant to the Fourteenth Amendment and as a result of a de facto policy not to protect pre-trial detainees from inmate on inmate violence." (*Id.* at 8).

Title 42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of [s]tate law." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

"Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." *Castro*, 833 F.3d at 1067–68 (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Specifically, in both the Eighth and Fourteenth Amendment contexts, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks and citation omitted).

As an initial matter, the second element has been satisfied. Defendants do not contest that the actions underlying the complaint were committed under color of law. *See generally* (ECF Nos. 42, 118). Instead, defendants assert that, even in light of the Ninth Circuit's holding in *Castro*, they are entitled to qualified immunity. (ECF No. 118 at 7–12).

   *1.   Qualified immunity*

When a plaintiff brings a § 1983 claim, government officials sued in their individual capacities may assert qualified immunity. *See, e.g.*, *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019

**James C. Mahan**
**U.S. District Judge**

- 6 -

(2014). Qualified immunity protects law enforcement officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly, and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Id.* at 244. By providing immunity against "insubstantial claims," qualified immunity allows for officials to make reasonable mistakes of law or fact regarding their conduct to execute their professional duties. *See id.* at 231.

Deciding whether an officer is entitled to qualified immunity is a two-prong inquiry. First, the court assesses whether the plaintiff has alleged a violation of a constitutional right. *Id.* at 232. Second, the court decides whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Id.*

### a. Constitutional violation

The Ninth's Circuit holding in *Castro* controls this court's analysis of whether a constitutional violation occurred in the instant action, providing the following considerations:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

833 F.3d at 1071.

First, defendants do not contest that the decision to house Morales and Munoz together was intentional. (ECF No. 118). To the contrary, defendants—having taken Morales's welfare into consideration—emphasize how deliberate they were in making that decision. (*Id.* at 19–20) ("Nurse Sheila Black interviewed and examined Inmate Morales and determined that he required medical segregation and medication.").

**James C. Mahan**
**U.S. District Judge**

- 7 -

As to the "substantial risk" prong of *Castro*, plaintiff argues:

> In this case, the proper method of determining that Morales was incarcerated under conditions "posing a substantial risk of serious harm" is to consider the result. That is, the fact that Morales was killed by Munoz, after less than four hours in the same cell, demonstrates that Morales suffered a substantial risk of serious harm.

(ECF No. 130 at 14).

To the contrary, the court "must not judge officers with the 20/20 vision of hindsight." *Sheehan v. Cnty. of San Francisco*, 135 S. Ct. 1765, 1777 (2015) (quoting *Graham v. Connor*, 490 U.S. at 386) (internal quotation marks omitted). Defendants, trying to protect Morales from a substantial risk of suffering serious harm, "afforded [him] greater protection than an inmate in the general population" because of his mental illness. (ECF No. 118 at 19). Defendants took deliberate steps to ensure that Morales was *not* put into general population. (*Id.* at 21). To reiterate, Morales was assessed by Nurse Black, placed in administrative segregation, and was prescribed medication. (*Id.* at 4).

Moreover, "Nurse Black did not discover any evidence that Inmate Morales needed further protection and specifically found him appropriate for a cell mate." (*Id.* at 19). Defendant Tenuta—who does not work as a nurse—relied on Black's evaluation when classifying Morales, and tried to ensure that he was housed with a compatible cellmate. (*Id.* at 11). The result was, as discussed above, the co-housing of two individuals who "were both suffering from emotional or mental problems, were the same age, had no gang affiliation, and were Spanish speakers" together. (*Id.*). Further, Tenuta received no evidence or alert as to a history of violence for either inmate. (*Id.*).

In sum, plaintiff has failed to meet the second element of a Fourteenth Amendment violation pursuant to *Castro* because defendants attempted to ensure Morales was not confined in conditions that constituted a *substantial risk* of suffering serious harm. As a result, defendants are entitled to summary judgment due to qualified immunity.

Even assuming *arguendo* that plaintiff is correct and that there was a substantial risk of Morales suffering serious harm by housing Morales and Munoz together, plaintiff fails on the third prong of the *Castro* analysis. 833 F.3d at 1071. Specifically, plaintiff has not shown that "a reasonable officer in the circumstances would have appreciated the high degree of risk involved" or that "the consequences of the defendant's conduct [were] obvious." *Id.*

**James C. Mahan**
**U.S. District Judge**

- 8 -

Double-celling is not a *per se* constitutional violation. *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051 (9th Cir. 2002) (citing *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981)). Moreover, double-celling an inmate with mental health issues, without more, is not constitutionally impermissible. *See Hammonds v. Martel*, 361 F. App'x. 813, 813 (9th Cir. 2010).

Here, the plaintiff offers little more than proof that Morales was double-celled with Munoz despite their respective mental illnesses. *See generally* (ECF No. 130). Specifically, plaintiff argues that it was unreasonable to double-cell individuals like Morales or Munoz prior to their psychiatric evaluations. (*Id.* at 16, 18).

There is no evidence to suggest that the conditions under which Morales was detained put him at a substantial risk of suffering serious harm. *Castro*, 833 F.3d at 1071. In fact, the practice of housing individuals with mental illnesses together prior to their psychiatric evaluations was common. (ECF No. 118-7 at 17). Despite this longstanding practice, Morales's killing was reportedly "the first and only murder that occurred at [NLVDC]."[1] (ECF No. 118 at 2). As a result, a reasonable officer at NLVDC would not have appreciated that double-celling inmates with mental illnesses subjected either inmate to a substantial risk of serious harm. *Castro*, 833 F.3d at 1071. Similarly, the consequences of defendants' actions—Morales's death—were not "obvious." *Id.*

Moreover, a single misdemeanor battery charge, pursuant to NLVDC classification policies, is not enough to label an inmate "violent" enough to warrant solitary confinement. (ECF No. 118 at 20). Further, Munoz had been *arrested* only for simple misdemeanor battery, and he had been released from Clark County Detention Center.[2] (ECF No. 130 at 3). As a result, even if defendants were aware of Munoz's single alleged battery, it would not alert a reasonable NLVDC officer that the *obvious* consequence of double-celling the individual, under the facts of this case, would be the death of his cellmate. *Castro*, 833 F.3d at 1071.

---

[1] The question of whether Morales was, in fact, murdered is not presently before the court. Here, the court borrows the parties' language, and passes no judgment as to the legal conclusion regarding Munoz killing Morales.

[2] Neither party specifies why Munoz was released from Clark County Detention Center. *See generally* (ECF Nos. 118, 130, 130-6).

James C. Mahan
U.S. District Judge

- 9 -

1    Tenuta relied on the booking officer's description of Munoz, which did not include a
2    warning of violent tendencies, and her own observations of Munoz. (ECF No. 118 at 20). Munoz
3    did not appear violent to Tenuta, unlike the combative inmate in *Castro*. *Compare* (ECF No. 118
4    at 5), *with Castro*, 833 F3d. at 1060. In *Castro*, an individual was arrested on a felony and his
5    intake form characterized him as combative. *Castro*, 833 F.3d at 1065. That man and Castro were
6    confined to a sobering cell together; Castro was violently beaten within hours of the pair's co-
7    confinement. *Id.*

Further, in *Castro*, the individual defendants did not dispute "that Castro faced a substantial risk of serious harm at the hands of [the other inmate] or that they failed to take reasonable measure to mitigate that risk." *Id.* at 1072. Here, defendants contend "[i]n applying her expertise to the situation posed by [i]nmates Morales and Munoz, Tenuta exercised her discretion in a good faith effort to maintain the integrity of the [d]etention [c]enter while at the same time ensuring order and safety." (ECF No. 118 at 14).

While the defendants in *Castro* did not contest that the combative inmate was a clear danger, 833 F.3d at 1072, and that housing him with Castro presented a substantial risk of serious harm, the defendants in the instant action took objectively reasonable steps to house purportedly compatible, apparently nonviolent inmates together. (ECF No. 118 at 19–21).

Additionally, plaintiff argues Morales was arrested for a sex crime. (ECF No. 130 at 2–3). Plaintiff asserts that Tenuta's decision not to classify Morales as a sex offender, plaintiff asserts, was the reason Morales was subjected to a substantial risk of serious harm. (*Id.* at 7). Specifically, plaintiff contends that Morales's "mental illness and sexual fantasy ideation put Mr. Morales at substantial risk of harm in a correctional setting." (*Id.* at 19). Further, plaintiff cites to the legislative history and purpose of NRS § 207.270. (ECF No. 130 at 17–18). Plaintiff argues, in sum, that "individuals whom [sic] are considered to be pedophiles are at tremendous risk in the prison population." (*Id.* at 6).

Contrary to plaintiff's argument, Morales was arrested for loitering about a school or public place where children congregate in violation of NRS 207.270. (ECF No. 118 at 3, 11). That statute provides in its entirety: "Any person who, without legitimate reason to supervise any of such

James C. Mahan
U.S. District Judge

- 10 -

1  children or other legitimate reasons to be at leisure in such place, loiters about any school or public
2  place at or near which children attend or normally congregate is guilty of a misdemeanor." Nev.
3  Rev. Stat. § 207.270.

4  Moreover, chapter 207 is a listing of "miscellaneous crimes"; there is no clear indication
5  that NRS 207.270 is a sex crime, despite plaintiff's argument to the contrary. Chapter 179D, which
6  concerns "registration of sex offenders and offenders convicted of a crime against a child," makes
7  no mention of NRS § 207.270. *See generally* Nev. Rev. Stat. §179D. Further, the intention of the
8  law does not clearly indicate that those guilty of violating it should be legally considered sex
9  offenders. *See* Nev. Rev. Stat. § 207.270. In the instant action, there is little case law dealing with
10  NRS § 207.270 beyond *Minor Girl v. Clark Cty. Juvenile Court Servs.*, 490 P.2d 1248 (Nev. 1971).
11  In *Minor Girl*, the Nevada Supreme Court did not decide whether NRS 207.270 was a sex crime.
12  *Id.* It decided that it did not impose liability on a fourteen-year-old when she loitered for fifteen
13  minutes. *Id.*

14  Although NRS § 207.270 "was *designed* to protect school children and young people from
15  local and itinerate sex perverts who may loiter near schools and public places awaiting the
16  opportunity to commit their crime," the court simply does not have sufficient persuasive legal
17  authority before it to definitively rule that NRS 207.270 is a sex crime. *Minor Girl*, 490 P.2d 1248
18  at 1250 (emphasis added).

19  As a result, a reasonable officer would not have appreciated the risk to Morales, and the
20  consequences would not be "obvious." *Castro*, 833 F.3d at 1071.

21  Having failed on the second and third elements outlined in the *Castro* holding, the court
22  need not address whether plaintiff met the fourth element.

23  Accordingly, the doctrine of qualified immunity applies, and defendants are entitled to
24  summary judgment as to plaintiff's § 1983 claim.[3]

---

[3] Further, plaintiff alleges that Morales's Fourteenth Amendment rights were violated due to a "de facto policy not to protect pre-trial detainees from inmate on inmate violence." (ECF No. 35 at 8). This argument, without more, would likely fail the second prong of the qualified immunity inquiry because of the "longstanding principle that clearly established law should not be defined at a high level of generality . . . the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks and citations omitted).

**James C. Mahan**
**U.S. District Judge**

- 11 -

**IV.     Conclusion**

In sum, plaintiff fails on the second and third elements of a Fourteenth Amendment violation claim as outlined in the Ninth Circuit's holding in *Castro*. Defendants' actions did not create a substantial risk of Morales suffering serious harm. Further, a reasonable officer would not have known of any such risk, and the consequences of the decision to double-cell Morales and Munoz was not obvious. As a result, plaintiff fails on the first prong of the qualified immunity inquiry. Without a constitutional violation, plaintiff's complaint fails as a matter of law, and defendants are entitled to summary judgment.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendants' motion for summary judgment (ECF No. 118) be, and the same hereby is, GRANTED.

The clerk is instructed to enter judgment accordingly and close the case.

DATED July 26, 2017.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**